FIRST NATIONAL BANK OF OMAHA, APPELLEE, V. EMMA GOODMAN, APPELLANT.*

FILED JUNE 9, 1898. No. 8636.

1. **Sufficiency of Evidence.** In a civil action a preponderance of the evidence proves any issue.

2. **Pledge: LIFE INSURANCE POLICIES: HUSBAND AND WIFE: EVIDENCE.** Evidence examined, and *held* to sustain a finding that policies of insurance in favor of a wife on the life of her husband, admitted to have been by her pledged for his debt, had been deposited as a continuing security and were not discharged by granting him extensions.

APPEAL from the district court of Douglas county. Heard below before KEYSOR, J. *Affirmed.*

*Isaac Adams* and *George W. Doane*, for appellant.

*J. M. Woolworth* and *Congdon & Parish*, contra.

*Rehearing allowed. See case next following.

IRVINE, C.

Charles F. Goodman entered into business in Omaha in 1868 as a druggist. The business prospered and was extended until it embraced a wholesale drug store. In 1887 the wholesale store was sold and the retail business was continued. For some years prior to the events creating this controversy it was conducted by a corporation known as the Goodman Drug Company, Mr. Goodman owning all the stock except a few shares which were held by members of his family. Mr. Goodman also became interested in the Omaha Brick & Terra Cotta Company and the Grandview Brick Company, corporations whose business is indicated by their titles, and quite largely in real estate. Except for a period prior to 1883 Mr. Goodman conducted his banking business with the First National Bank, and seems to have been practically all the time a large borrower on behalf of himself and the corporations in which he was interested. The debt was represented by divers notes, made from time to time, and at their maturity paid or renewed, apparently at Mr. Goodman's volition. In 1887 the debt amounted to $47,500. Early in that year, from the proceeds of the sale of the wholesale store, it was entirely paid. Before the close of 1887 Mr. Goodman began to borrow again, and the indebtedness gradually increased until 1890, when it was almost $63,000. It was subsequently reduced to $39,000, but grew again until it reached, in 1892, $45,000. The foregoing facts are important in showing that, instead of occasional single loans, paid at maturity, Mr. Goodman's debts to the bank arose out of a constant series of transactions, the amount fluctuating, but the distinct affairs merging in a continuous course of dealing, understood by both parties in that light. The debt in 1892 was made up of several notes—individual notes of Goodman, notes of the drug company with Goodman as joint maker, and notes of the brick company to Goodman and another and by them indorsed to the bank. The only se-

curity then held by the bank was Goodman's stock in the drug company, which had been pledged as a general cover. In 1892 Mr. Kountze, the president of the bank, asked Mr. Goodman to reduce his indebtedness or secure it. Mr. Goodman informed Mr. Kountze that he held much unincumbered land, and also life insurance policies to the amount of $45,000; that when the bank should desire it he would mortgage the land and assign the policies. Thereupon the bank continued its policy of renewing his notes. In December, 1892, one of the notes maturing, Mr. Kountze again requested security. Mr. Goodman said he did not wish to give it at that time, but repeated his promise to give it upon demand, and renewals were again granted. Mr. Goodman was then endeavoring to obtain a loan on his real estate which would enable him to discharge his existing debts. February 20, 1893, a note again maturing, a demand was made for the promised securities, and Mr. Goodman promised to bring to the bank a memorandum of his land, his certificates of stock in the brick company, and the policies of insurance. Certain notes then maturing or past due were then renewed. At this interview Mr. Goodman asked what the bank would do as to renewing paper if security were given, and Mr. Kountze answered that the bank would carry the paper along as it had been doing, renewing for periods of sixty or ninety days, as long as the securities were satisfactory and the condition of the bank and general financial conditions should allow. Mr. Goodman then said that he might need further moneys, and Mr. Kountze said that in case of emergency the bank would aid him. Soon after this, and prior to March 1, Mr. Goodman brought in the instruments, and it was then discovered that Mrs. Goodman was the beneficiary of every policy. The bank took steps to ascertain how in that condition the assignments could be perfected, and found that policies to the amount of $13,000 were in companies which permitted no assignments. Forms of assignments of the remaining policies were prepared ac-

cording to the requirements of the companies issuing them. March 1 a loan of $2,000 was made by discount of a note of the brick company, and Mr. Kountze then drew up, at Mr. Goodman's request, an instrument which the latter signed, reciting a pledge of the life insurance policies, and directing the bank, in the event of its applying their proceeds to his debt, to deliver the stocks pledged, after satisfying the debt, to Mrs. Goodman. This instrument contained the following by way of recital: "The money arising from said policies when collected shall apply on any indebtedness of C. F. Goodman or the Goodman Drug Company to said bank." Mr. Kountze about this time drew up a mortgage of the land listed by Mr. Goodman, conditioned in broad terms to secure existing and future indebtedness and renewals. On the morning of March 8 Mrs. Goodman went to Mr. Goodman's place of business and was there met by Mr. Gates, the assistant cashier of the bank, and by Mr. Bexton, its collection clerk, who was also a notary public, Mr. Gates bearing with him the mortgage and the assignments of the policies. Without any inquiry or conversation with reference to the nature of the contract Mrs. Goodman then signed the assignments and signed and acknowledged the mortgage, and Mr. Gates took them back to the bank, where they were retained. Subsequently all the notes, except one, were extended by the payment and receipt of interest in advance, such payments being indorsed on the notes. Later in 1893 other notes were made. One of these was secured by mortgage on land in Lancaster county, conditioned also as a continuing security for all indebtedness, Mrs. Goodman joining in its execution. Part of the proceeds of these later notes went to the payment of Mr. Goodman's individual overdrafts, part to the payment of taxes, chiefly on the mortgaged land, and the remainder was indorsed as payments on some of the old notes. On a date not disclosed by the printed abstract on which the case is submitted, but stated to be January 4, 1895, the bank brought this suit to foreclose

the mortgages and subject the stocks to the payment of the debt. The petition alleged the pledge of the policies, but asked no relief as to them. Mrs. Goodman was made a party apparently solely to bar dower in the land. January 11, 1895, Mr. Goodman died. Mrs. Goodman was made executrix of his will. The bank collected the life insurance, applied it to the notes then held by it, and presented, proved, and caused to be allowed its claim against the estate for the amount of the debt, less the proceeds of the policies. In the probate proceedings no objection was interposed by Mrs. Goodman to such application. She, however, began suit at law to recover the proceeds of the policies, but afterwards dismissed that suit without prejudice. In the meantime the bank, by supplemental petition in this case, had set up the death of Goodman, its collection of the life insurance and its application to the debt, and asked to have its right to so apply it adjudicated. Mrs. Goodman by her answer set up in effect three defenses: want of consideration, undue influence, and discharge of the securities by extending the time of payment of the notes. The court found generally for the plaintiff, and found specially, also for the plaintiff, as to the defenses of undue influence and want of consideration. It is contended that the general finding was insufficient to cover the issues as to discharge, but we think otherwise. The decree directed that the land be first sold, then the stocks; set aside the application made of the insurance, and directed that it be held by the bank at interest at the rate the notes bore, and applied if necessary to the debt after the other security should be exhausted, the surplus to be paid to Mrs. Goodman. Mrs. Goodman appeals.

The case as presented is peculiar in this, that counsel almost agree as to the law, and there is no material conflict in the evidence, yet the solution of the case is by no means simple or free from difficulty. It depends upon inferences from established facts. It is conceded that the evidence sustains the findings so far as regards the

defense of undue influence. It would hardly be contended, in the face of the decisions of this court, that the extension of the existing debt of the husband is not a sufficient consideration for the pledge of the wife's property; but it is contended, and the appeal rests on that contention, that the pledge of the policies was only for the security of the existing debt and in the form it then bore, and that the subsequent extensions discharged the pledge.

On this phase of the case it is asserted by the appellant, and conceded by the appellee, that the following propositions are sound: (1.) The relations of Mrs. Goodman to the bank were those of pledgor and pledgee. (2.) Her relations to the bank with reference to the property were also those of surety and creditor. (3.) In case of any change in the rights existing between principal and creditor, property of a third person, pledged for the debt, is discharged, unless the owner consent to the change. (4.) It is only by virtue of a special agreement that a pledge operates as a continuing security. (5.) Acceptance of interest in advance presumptively constitutes an extension of time of payment. A recognition of these principles narrows the controversy to this question: Was the contract between Mrs. Goodman and the bank one for a pledge by way of continuing security, or a pledge for specific notes? The question is one of fact alone. It is conceded that a pledge for some purpose was intended and actually made, so that no questions arising out of the appellant's status as a *feme covert* are involved. Her acts and her obligations, in ascertaining the particular nature of the contract, are to be judged as if she were a man or a single woman. Notwithstanding the general rule for the construction of contracts of suretyship, there is fair ground for the argument that when the written contract is on its face one for the absolute transfer of property, as were these assignments, the burden should devolve on the grantor to limit the effect of the apparently absolute conveyance. But we regard the concession of the fourth

proposition of those just stated as equivalent to an assumption by the plaintiff of the burden of proving that the pledge was by way of continuing security. To get a proper view of the facts it is first necessary to learn the nature of Mr. Goodman's contract with the bank. From what has been stated it appears beyond all question that by him and the bank it was understood and intended that the policies, like the stock and the mortgages, should operate as a continuing security and a general cover. Indeed, it is evident that Mr. Goodman's main purpose in complying with the demands of the bank was to obtain extensions and further credit. While he hoped to obtain a loan on the security of his land, he had been compelled to obtain extensions while seeking the new loan, and he must have been convinced by the time the securities were given that there was no immediate prospect of his so obtaining means to pay the bank, and that with notes maturing from time to time at short intervals, further extensions and further credits were necessary. To learn Mrs. Goodman's position a further statement of facts is essential. The policies had never been in her possession. Mr. Goodman had always retained them and paid the premiums. The relations of Mr. Goodman and his wife had always been those of affection and confidence. Mrs. Goodman occupied herself with her domestic duties and neither knew nor cared to know much of Mr. Goodman's business affairs. She knew, nevertheless, that he was in debt to the bank and was in financial difficulty. About March 1, 1893, Mr. Goodman told her that Mr. Kountze wanted him to assign his life insurance "for his indebtedness;" that Mr. Goodman thought he would have to do so to keep Mr. Kountze quiet until he could make a loan and pay the bank; that Mrs. Goodman need not fear, it would all come back to her. Mrs. Goodman said that she did not think it was right for her to do it or for Mr. Kountze to ask it. Mr. Goodman said it was only for a short time. Nothing further was said until the morning of March 8. Mr. Goodman then

asked her to come down that morning and sign the papers. She said she did not want to do so, and that if she were asked if she was willing she could not answer that she was. Mr. Goodman said: "Oh, Emma, you must not do that," meaning she must not say she was not willing. She made no further protest, but went to Mr. Goodman's office as requested, where, as already stated, she executed the mortgage and assignments without any conversation on the subject. The foregoing is from Mrs. Goodman's testimony. In addition one of her answers in direct examination is significant as well as touching. She was asked who presented the papers for her to sign, and answered: "I think it was Mr. Gates. I think that was the name. I think it was; I would not be positive. Mr. Goodman introduced me to him, but my feelings were such that I did not care whether he had any name." She further testified that she understood the purpose of the assignments, and in three different places she describes that purpose as securing "Mr. Goodman's indebtness at the bank." It will be remembered that both mortgages executed by her plainly expressed their object as a continuing security; but much of the probative force of this fact is destroyed by Mrs. Goodman's testimony that she did not read the assignments before signing them. Very probably she did not read the mortgages. Studying the foregoing facts, together with all the circumstances, we are led to the conclusion that Mrs. Goodman did not concern herself as to the character of the pledge or the nature of the debt. She realized that she was pledging a provision which Mr. Goodman had made for her, for the satisfaction of his debt to the bank; that she was thereby placing in jeopardy what might be her only resource in case of widowhood. She did not wish to do so, she protested to her husband against doing so, but yielded to his persuasion and assurance that she would regain the policies. She complied with his wishes finally to the full extent of the phrase. There is hardly enough to warrant the inference that she knew that his

purpose was to obtain further extensions in the technical sense, but she certainly knew that the object was to postpone in some way the day of settlement with the bank. There is nothing whatever to indicate that she knew how the debt was represented or that she intended to secure the specific notes then outstanding and no more. If she thought of the matter at all she would know that such a specific pledge for a short time would almost certainly sacrifice the policies. Her reluctance was to part with the policies at all. Having consented to part with them, she did so according to her husband's wishes, to fulfill his promises and to accomplish his purposes. His purpose was to obtain further extensions. Her mind and her acts must be read in this light. When she yielded to his importunings it was evidently by making his undertakings her own.

In this connection it is argued that the law requires something more than a preponderance of the evidence to establish a continuing pledge. Authorities to that effect are cited. Several cases say that such an intention must be clearly expressed. A text-book (Baylies' Sureties and Guarantors p. 7, note 1) is cited to the proposition that a guaranty will not be construed as continuing "unless the intention of the parties is so clearly manifested as not to admit of a reasonable doubt." The incorporation of this phrase, borrowed from the criminal law, into a statement of evidence in civil cases, is not, as might be supposed, the reckless statement of a text-writer, but has a certain sanction in the reports. The language was used by the editors of the American Leading Cases (vol. 2, p. 33) in a note to *Lent v. Padelford*, citing cases not supporting the statement. In *Birdsall v. Heacock*, 32 O. St. 177, the court announced at the beginning of the opinion that such a contract should be construed according to the same rules as any other, and proceeded upon that theory, but unfortunately quoted, with apparent approval, near the end of the opinion, the foregoing language, citing the American Leading Cases. Mr. Baylies quoted Messrs

Hare & Wallace's note, with its citations, *verbatim*, it having obtained from *Birdsall v. Heacock* a sort of *ex post facto* judicial sanction. Somewhat similar loose language with regard to the degree of proof has been used in other connections in *obiter dicta*, and has found its way into some cases in our reports; but this court, when the question was directly presented, took occasion to disapprove such statements and to announce that a preponderance of the evidence proves an issue in any civil case. (*Stevens v. Carson,* 30 Neb. 544; *McEvony v. Rowland,* 43 Neb. 97; *Wylie v. Charlton,* 43 Neb. 840.) The more reasonable, the more obvious, the more probably true construction of this contract accords with the finding of the trial court. In a civil case we are not at liberty to reject the more reasonable, the more obvious, the more probably true view of the evidence, and accept the less reasonable and the less probable, because of any technical rule of proof by which the latter is fortified. Nor may we reject the more reasonable and the more probable from sentiment of sympathy, which, if it could have sway, would here exert a strong influence in favor of the appellant.

AFFIRMED.